May it please the Court. My name is Brian Rademacher. I'm with the Arizona Federal Public Defender's Office, and we represent Appellant Jonathan Thomas. I'll try to reserve two minutes for my rebuttal. I'm going to first address the drug dog-related issues. I hope at the end to briefly comment about why the Court should also overrule the district court's decisions on speedy trial, impeachment by contradiction, and sentencing. One technical question, Mr. Rademacher. My notes show that the release date for the defendant is August 13th of this year, so it's he's he'll he will be released on the 13th of August. Is that correct? I think that's about right from my recollection. But of course, that doesn't moot out the case because he'll still be on supervised release. Have you engaged in any kind of a settlement or negotiation with the State based on the release? Is it going to be then that might be applicable to both? No, Your Honor. One of the facts in this case, which is of some concern to me, before you even get to the K-9 search, is that it seems that the facts here are undisputed that your client consented to the search. That's not correct, Your Honor. What facts do I have in here that say your client did not consent? I realize that no court has addressed that issue, but I guess I'm trying to figure out, if there are no facts suggesting he didn't consent, why shouldn't you just affirm on that basis and forget it? At the motions press hearing, Mr. Thomas testified, and he stated that he did not consent, that the officer was wrong about him giving him the keys, he was wrong about his the understanding of his response, that the keys were in the ignition, that he yelled at the officer, that the officer yelled at him to produce the keys. The officer then went to the ignition and got the keys and opened it on his own. So there's a direct conflict in the testimony. Was there any finding made? No. The just the both the magistrate and the district court did not make any findings and did not rule. They did not even get to the issues, as I understood it. That's correct. And the government has conceded in its brief that the court would need to remand for that matter. But I would also point out that if the search is deemed illegal, we, it's our position, that that taints the consent, because he was in custody, he was previously told, you might as well tell us and confess, because we're going to find this with the dog. He stood and watched the illegal trespass on his truck, and it was only after that as a taint. Now, counsel, this is pre-Jardinus, right? So presumably the search is okay. The exclusionary rule does not apply prior to that case, does it not? Well, this case is much different than the case that Your Honor wrote in Pineda-Moreno. In that case, there was prior precedent, the MacGyver case. Pineda-Moreno 2? 2, yes. Okay. It did, in that case, the court did rule that the officers could rely on good faith because there was prior precedent, the MacGyver case, which had specifically approved the police officers putting a magnetized GPS unit. So it was that very matter from the Ninth Circuit that the officers were able to rely on. In this case, there is no such similar case law. The government hasn't cited any. In fact, the Supreme Court, in its cases of Edmonds and Cabayas, the only thing the drug dogs around the car in public space, not to intrude in trespass on the vehicle. The cases that it does cite, and it can't cite any Supreme Court or Ninth Circuit case that has approved a violation with the drug dog on a vehicle. The other cases it does cite are either not precedential, they were subsequent to this action, and involve some incidental touchings which were not done for the purpose of a search and did not gather any information. So there is no prior precedent for them to rely on. What about Nava? It seems to me Nava says if there's testimony of the dog's reliability other than the handler's testimony, then further disclosure is not necessary. On the disclosure issue? Well, we – I think you've answered the other issue. I just was moving to disclosure. No, I understand that, Your Honor. I don't think that – You got the training and certification records. There was testimony of the dog's reliability other than the handler's testimony. If I read Nava, it seems to me that's all you need. Well, we disagree on the reading of Nava. I can't remember the facts off the top of my head on Nava, but my recollection is that the defendants got all the records they wanted in that case. I would just point out that the Supreme Court's recent Harris case confirms what we rely on, Sedano-Arellano, that they have to be disclosed. In Harris, the Supreme Court just recently said that if a dog is well-trained and certified, it's alert, and in that case they mean indication, not the alert that's if they alert, that can constitute probable cause. But the Court was very careful to point out it can only do so when a defendant has the records and has the opportunity to challenge the reliability. And without the redacted – without the – without redacted records, the complete records in this case, the defense could not do that. The – the dog – Counsel, let me ask you about that. Page 216 of the record, this is the K-9 detection team certification score sheet. Yes. With a lot of redactions. Right. We're going to hear from the other side, of course, but what is your contention that the redaction prohibits or at least bars your testing on reliability? What – if it were not redacted, what could it possibly tell you? Well, it's just not the redaction on that page, but it's the redaction on all the subsequent pages, the performance training biweekly. Now, let's be specific. Page 217, that – the comments? 217. Right. 217 to about 230. All of those are the biweekly performance ratings. What the agents here admitted is that these are comments that could well have related to problem areas of the dog or of the handler. The problem in this case is that no one knows what these comments mean. The comments may say exactly the problems that we perceive in this case, that the officer is relying on non-trained behavior versus indications, that – or there's other problems with either the handling or with the dog. The prosecutor in this case, the agent in this case, had never seen these comments. The district court never looked at these comments unredacted in camera. So no one knows what these comments say. They may well say the problems that we perceive exist with bad performance by the dog or problem performance by the dog if the officer, for instance, relies on untrained behavior without a dog indication. But the grades are not redacted. They're all revealed, are they not? They are. But it's pretty unusual to have a lot of comments like this. The officers themselves admitted that these could be relevant to problem areas for the dog and the handler. And a defense under Harris should have a complete opportunity to test the reliability. That's the important factor in these dog cases, is that it's the reliability of a well-trained dog, that the defense has an opportunity to show to the court that there are problems and it shouldn't be relied on for any specific reason. Well, speaking of relevance, what is the relevance of this argument anyway? Your defense wasn't anything to do with this. It was all about duress. Well, if – if – It didn't have anything to do with – Disclosure? It didn't have drugs or anything like that. It was all about duress. Right. But if they – if they – if they could not prove the dog was reliable and that the alert was reliable, there would have been no probable cause for the search. Without the search, they would not have any – they would have no drugs. They would have no drugs without the search. But you didn't argue that. Your argument wasn't they wouldn't have any drugs. Your argument was we were forced into doing what we did. Well, if duress – That's a totally different argument that you make here. Why is it relevant that we take up this issue? Because the drugs were not suppressed. Had they been suppressed, which would – Your defense would have been different? There would have been no case, Your Honor. They would have no drugs. They could not have prosecuted. So once the Court overruled or rejected the suppression argument, the drugs came in, and that's what the defense was. If the drugs hadn't come in, the defense would have been different. I don't think they could have brought their case. So that's why the search issues and the drug reliability issues are so important. It's a live issue. Well, I worried about that, and I also worry about talking anything about trespass, because that wasn't argued below either. No. As Judge O'Scanlan was just mentioning, though, there are no cases, no prior precedent that the agents were able to rely on this. I pointed out in Rule 28J letter we filed that I've read Katz and Olmstead and cases subsequent to that a little bit better, but one of the cases, Knott's, specifically says that Katz overruled the trespass theory. So he could not have – we could not have brought that trespass theory in the district court because it wasn't the law. This Court itself, I think it was in the Head case or one of the other cases that I mentioned, also said trespass theory isn't relevant. So it could not have been raised before. And under the Supreme Court's new Henderson case, if an error – a matter becomes – error becomes plain on appeal, we can raise that. We did raise the Jones argument because it was a case that it revived the trespass theory that nobody thought existed, even the government in that case. The dissenting judges, the justices in that case, believed that the trespass theory was dead, that it didn't – it was no longer effective. So we couldn't have raised the issue below. It would have been futile. I accept your argument. I remember being in the same case that Judge O'Scanlan wrote, and he didn't ever think about trespass until Justice Scalia put it on the books. And, of course, the Jones case revived that and, of course, made us realize that it is a theory. If I could turn to whether there was an unlawful search or not, the answer is yes, because we have just learned from the Supreme Court in both Jones and Jardines that the police violate the Fourth Amendment when their use of a drug detection dog actually involves a trespass. And that happened in Thomas' case because the agent directed with his hands for the dog to smell up on the tool chest. The dog then followed his lead and physically intruded on the truck by placing not just its paws, but its nose, and by keeping it on the tool chest. And the officer learned information from that that was important to his assessment of probable cause. The government's only response about why this is not a trespass is that it was just a momentary touching. But the Supreme Court rejected that very argument in Jones by what it said and what it did. Now, is this event pre-Jones or post-Jones? The trial and the defense? No, no. The dog sniff. It's pre-Jones. Well, under Davis, under Davis, don't we have to take a look at the law as it existed at that time? Yes. And the government says there was prior binding legal precedent, but it's not able to cite any at that time. What's needed is a case that specifically approves it, that officers can rely upon. The issue in Pineda-Moreno 2 was that there was such a case. Prior to the search in that case, MacGyver was established law. In MacGyver, this Court had already approved, as lawful under the Fourth Amendment, putting a magnetized GPS unit on a car. There's no such case here. The government hasn't been able to cite a case. In the Supreme Court law, basically their limit was you can walk a dog around a car, but you cannot – it didn't say this, but it only said that the police officer is going to walk it around in public space. If I could make some – a brief comment. So, in sharp answer – Jones answered the question clearly that a momentary trespass is sufficient for a Fourth Amendment violation. Just turning to the question of whether there was probable cause, the answer is no, because in this case, the agents relied on untrained behavior, and that is insufficient to be an objectively reasonable basis for probable cause, especially when the Court's approval of the use of drug dogs depends on their trained behavior. Now, the government – the way the agents explained it, an alert in this case means the untrained behavior that the dog is doing when it's searching. The indication is the trained behavior that the dog is taught to do. Here, it would have been sitting. But that's different than how the Supreme Court and the parties in Jardine and Jones understood it. The Supreme Court there – or in Harris, rather, in Jardine – in both those cases, the Supreme Court called it an alert. But when they said alert, they meant the trained behavior, which is an indication in this case. So when the – because in both those cases, the dog went through to the final complete act, which was an indication of the trained behavior, and sat down. So when Harris holds that the reliable – that the alert of a reliable trained dog is enough for probable cause, it means the trained indication. And the agents in this case never – essentially, they concede, and the Border Patrol forms indicate that indication is critical to the training, to the testing, and to the certification. Agent DuBois, he admitted that if a dog fails in its indication, essentially, it won't be certified. And that's the problem in this case. So the rule we say is that untrained behavior can be considered in the totality of circumstances, but it cannot alone constitute probable cause. Very well. Thank you, counsel. The time for your side has expired. We'll hear from the government. May I please record, my name is Bruce Ferguson, Assistant United States Attorney on behalf of the government in this case. There are a lot of questions raised here, but I think that if we take a look, a close look at Harris, it actually simplifies a lot of these issues and makes the outcome very clear that the evidence was, in fact, properly admitted. What Harris tells us is that probable cause can, in fact, be presumed from a dog alert when it's a trained and certified dog, which this was. And there's no dispute about that. So what about- Well, that is not exactly undisputed, is it? I mean, what they're saying is, we don't know how to deal with that, because you didn't give us the stuff. And we didn't get a chance to see, and we didn't get a chance to then argue about whether that dog is really as good as you say it is. Well, not exactly. What is undisputed is that the dog was certified at his original training and then was annually recertified twice. In addition to that, we have the biweekly so-called green sheets, which are these regular maintenance trainings, which is what the documents and the excerpts are from which there are some parts blacked out. And really, we don't even need to get to what those blacked out parts are, because the expert, Agent Dubois, who was the supervisor for the whole area, testified, and the district court found that whatever those comments were would not have changed its decision that, in fact, this was a reliable dog. That sounds all very good, except that we don't know what's in there, and we don't know for sure that's true at all. Well, didn't the agents testify at the hearing that the redacted portions could be expected to contain weaknesses and areas of improvement for the team? Could. It might also include attaboys, as we used to call them in England. I understand that. So it could be. They didn't say it could contain both. What bothered me was they said it could be expected to contain the weaknesses and the areas of improvement, and nobody ever gave that even to the judge. Because the bottom line was that he was always certified, he never failed. So whatever those potential weaknesses were, they were essentially insignificant. If there was testimony that if the dog had failed in any one of these categories on any one of these trainings, he would immediately have been pulled off the line and sent back for retraining. So the evidence is that regardless of what those comments may or may not have been, all speculation, he was, in fact, a reliable dog. He was a reliable team, otherwise they would not have gotten all those passing scores. How did the dog's nose get to the toolbox? The way Agent O'Place described it, part of the training and part of the technique is for him to indicate, well, let's not put indicate in there. He directs the dog with his hand in a W pattern to go high and low to make sure that the dog is surveying the entire scene, if you will. And the dog responds to that, which is a trained behavior. How did he, how did the dog get up in the place where the toolbox was? It's what dogs do. He reared up on his hind legs as he was following this direction to go high and low, and so he rears up and then drops down as he progresses around the truck. And when he got to that area of the toolbox, that's when he stuck his nose on it. Did he jump up into the bed of the pickup truck? At that point, no. The testimony was a little bit unclear, but it turned out that after he had alerted in that fashion and the defendant had been removed and the toolbox actually opened, in order to reinforce the training and show the dog that he'd done correctly, LaPlace then allowed him to get up into the bed of the truck. So as far as the truck was concerned He leaned on the pickup at all to touch the toolbox. Before the actual revelation of the marijuana, no. He, well, nose maybe. I'm not sure how tall the dog was so far. You mentioned that it was not a trespass because it was just a momentary touching. The dog's nose gets up there and he sniffs this. Yes, Your Honor. But now when a pickpocket relieves you of your wallet in a New York subway, that's just a momentary touching. Well, it's an intrusion. He sticks his hand into your pocket. And that's the significant difference here between Jardine, for example, and the prior cases. Jardine was very clear. As a matter of fact, I noticed that it states no fewer than nine times the term physical intrusion. And you're talking about a particularly protected area, the home. This is a car. This is the exterior of a car. Unlike- A lot of people live in their cars. But it's only the exterior. And it's not a home. The court's been very clear about that. And unlike, for example, Jones, which they talked about it being physically occupied, in a sense, by the placement of this GPS thingy on it, which he then drove around for months. That's not a momentary pressing of a dog nose against the side of the truck. I gave you the restatement of torts, which talks about trespass. And there was no dispossession. There was no damage done. There was nothing done to modify the value of the truck. It was simply a brushing against it. And so we have cases like this court regularly says, agents can go and tap on gas tanks to detect them. In a Supreme Court sharp case, the agent bounced on the bumper to see if the car was bouncing, was moving properly. So these kinds of momentary touchings don't amount to a trespass, which is what Georgine and Jones was all about. What about the role of the agent here in directing the dog? I'm looking at page 135 of the transcript. And there's a discussion about after you cast your hand by the toolbox, that is the agent, the dog jumped up in secondary. What's the role of the agent here, and to what extent should we be looking at his conduct? As I was indicating, he described working his way around, actually, starting at the tailgate, going around the passenger side, front driver's side, and finally getting to the point where the gas tank and the toolbox are in the bed. And so what he's doing is not telling a dog sniff at that toolbox. He's simply directing it in this W pattern to work its way around and sniff the air around the entire vehicle so that he does a thorough job. It's not like he- The key is he's not focusing on a particular target. He's doing the general. All right. Okay. Thank you. So I would suggest that, in fact, even if we want to talk about Jones and Jardine and Trespass, those, in fact, are subject to the retroactivity problem because- Because of Davis? Yes. And this Court's most recent case dealing with the retroactivity of Jones itself. Which one is that? Pineda-Moreno. Oh, Pineda-Moreno 2. Yes. Yeah, on remand, right. Because, essentially, we're talking about this Trespass theory, which nobody had thought about, but it could have been raised. As a matter of fact, in the 2007 Olivera-Mendez decision, which I cite to the Court from, I believe, the Eighth Circuit, that kind of a claim was raised. So it's not impossible to raise. In habeas cases, this Court says, well, the apparent futility of making an argument is not a basis for not making it. You still have to exhaust that. And the same thing is true here. He could have made that argument, even if, yes, there was authority that was against it. So he's not entitled to suddenly say, oh, now, here's this case which is kind of like this, but it deals with houses and not cars, and suddenly I'm entitled to get reversed on that basis. Anything further? Just very briefly, what is it that Harris actually says? And this addresses the redaction issue. Harris reminds us that probable cause is based on the totality of the circumstances, and it specifically said you don't nitpick about one piece of the puzzle. You look at all of those circumstances. So that's why, when we look at, for example, the redacted portions of the records, potentially probative. But they said we don't look at what you don't find. We look at what you do find. We look at the evidence that you do have, which supports probable cause, and we have this uninterrupted chain of certifications and biweekly records right up to the date of the search, all saying this is a reliable dog. And so the fact that, theoretically, there might have been something else out there doesn't change the fact that probable cause was established. Also as far as what kind of a hearing is held, there's a little line in Harris where it talks about the probable cause hearing that can be held, and it says, consistent with the usual rules of criminal procedure. And I don't think that you need to get that far, but that brings us right to the argument that I made about the meaning of Rule 16. We have why were these things redacted? There is specific testimony that these were the kinds of comments which potentially could defeat the whole purpose of having dogs, because if they got out, they would explain how they're trained and, therefore, how the bad guys could evade the searches. Scalia. Well, that seems to me to be an issue for a district court, not us. I mean, the district court really didn't focus on it.  The district court didn't even look at it. It was made, Your Honor, and that's what it was. Oh, but they didn't even look at the records. There was no need. They don't know what the real records said. If you were going to argue all of these arguments in front of them and they had had a chance to look at it and determine it, that's one thing. Well, the they didn't really. There's nothing in the district court record about that. The agent explained why it was when it was said this was a good thing. Where does the district court address what argument you're making now? It did not. A privilege. In those terms, it didn't. But what it found was that no additional records, i.e. the redacted portions, were necessary. I understand what it said about that. So we have to determine if Harris and other cases would say that the district court is wrong. But the defenses that you might have, it seems to me, is a district court decision, not one of ours. Well, the district court said. We are not going to look at these records. The district court said, based on what's in front of me, there's plenty. And that's consistent with what Harris tells us about how PC is supposed to be established. If the court has any other questions, I'll answer them. No questions. Thank you very much, counsel. The case just argued will be submitted for decision.
judges: Goodwin, O'scannlain, Smith